IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **BILLY JOEY BOOKMAN,** § | |
| Plaintiff, § | |
| § | |
| *v.* § | Civil Action No. 3:13-CV-4428-B-BK |
| § | |
| **CAROLYN COLVIN,** § | |
| **Acting Commissioner of Social Security,** § | |
| Defendant. § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3*, the undersigned now considers the parties' cross-motions for summary judgment. For the reasons that follow, it is recommended that Plaintiff's *Motion for Summary Judgment*, Doc. 17, be **DENIED**, *Defendant's Motion for Summary Judgment*, Doc. 19, be **GRANTED**, and the Commissioner's decision be **AFFIRMED**.

### I.   BACKGROUND[1]

**A.   Procedural History**

Plaintiff seeks judicial review of a final decision by Defendant denying his claim for Supplemental Security Income ("SSI") under the Social Security Act ("the Act").[2] His application was denied at all administrative levels. Doc. 15-3 at 24-31; Doc. 15-4 at 2-5; Doc. 15-5 at 8-13, 17-19. Subsequently, The Appeals Council denied review. Doc. 15-3 at 6-9, 14-17. Plaintiff now appeals to this Court pursuant to 42 U.S.C. § 405(g).

---

[1] The following background comes from the transcript of the administrative proceedings, Doc. 15, which is split among ten documents, Docs. 15 to 15-9.

[2] Plaintiff also initially applied for Disability Insurance Benefits; however, at his hearing before the Administrative Law Judge ("ALJ") in August 2012, Plaintiff amended his disability onset date to August 24, 2010. Doc. 15-3 at 24. Since the revised onset date was after his date last insured, March 31, 2005, Plaintiff conceded that his claim for Disability Insurance Benefits effectively was withdrawn and, thus, further administrative proceedings and this appeal concerned only his SSI claim. Doc. 15-3 at 24.

**B. Factual Background**

At the time of his alleged onset of disability, Plaintiff was 54 years old. Doc. 15-4 at 2. He has a high school diploma and was previously employed as a truck driver, repairman, and dump-truck driver. Doc. 15-3 at 58-59, 63.

*1. Physical Impairments*

On October 1, 2010, Plaintiff presented to Dr. Anuradha Tavarekere for a disability evaluation, complaining of cervical degenerative disc disease. Doc. 15-8 at 27. On physical examination, Dr. Tavarekere found no medical issues with Plaintiff's neck and spine. Doc. 15-8 at 28. He found tenderness in Plaintiff's elbows and hands but observed no enlargement of his joints or limitations in his range of motion. Doc. 15-8 at 28. However, Dr. Tavarekere noted some limitations in range of motion in his examination of Plaintiff's cervical spine, and referred Plaintiff for an x-ray. Doc. 15-8 at 29.

On October 8, 2010, Dr. Ying Zhao, a radiologist, reviewed three views of Plaintiff's cervical spine and found his alignment, vertebral body heights, and curvature to be maintained. Doc. 15-8 at 26. He noted that mildly decreased disc space was present at C3–4, C5–6, and C6–7 levels with anterior osteophyte formation. Doc. 15-8 at 26. Dr. Zhao found no additional defects and concluded that no subluxation or fracture was identified. Doc. 15-8 at 26.

In November 2010, Dr. Roberta Herman conducted a case assessment of the records of Drs. Tavarekere and Zhao, and concluded that Plaintiff's cervical degenerative disc disease was not severe, noting that Plaintiff only takes over-the-counter medications for pain and was able to mow the lawn, walk to get around, and shop. Doc. 15-8 at 30.

On July 16, 2012, Plaintiff sought treatment in the emergency room of Parkland Hospital, complaining of arthritic pain in his elbows and hands. Doc. 15-9 at 33, 37. Plaintiff described

generalized joint pain for two to three years, and stated that he had been taking 200 milligrams of Ibuprofen but experienced little relief. Doc. 15-9 at 37. Laura Martin Rangira, R.N., noted bilateral swelling in Plaintiff's elbows, wrists, and hands, but that he ambulated without difficulty. Doc. 15-9 at 37. On physical examination, Dr. Pushpa Pathak found "no deformity of any joints," with intact range of motion, and intact range of motion and "no focal tenderness" of the cervical spine. Doc. 15-9 at 38. After about two hours, Plaintiff was discharged and prescribed Ibuprofen and Tramadol as needed for his pain, and told to revisit the emergency room if his symptoms worsened. Doc. 15-9 at 36.

### 2. *Mental Impairments*

Plaintiff presented to MetroCare Services for a psychiatric diagnostic interview on December 1, 2010. Doc. 15-8 at 37. Plaintiff reported that he felt depressed all the time, had difficulty sleeping, and was having audiovisual hallucinations. Doc. 15-8 at 38. He stated that he wanted to "get an income by apply [sic] to SSI because he can't [lift] over so many pounds." Doc. 15-8 at 41. Dr. Ikechukwu Ofomata diagnosed him with major depressive disorder, single episode, severe with psychotic features, alcohol dependence, and personality disorder. Doc. 15-8 at 34. Dr. Ofomata indicated that he would start Plaintiff on antidepressants and anxiolytics to control his symptoms, and noted that Plaintiff "will be suitable for disability." Doc. 15-8 at 39. He prescribed Effexor XR, Benadryl, and Risperdal. Doc. 15-8 at 39. Subsequently, on December 10, 2010, Plaintiff reported that he was able to sleep at night with the help of his medications and, although he was depressed "from time to time," he was able to identify one way he deals with depression. Doc. 15-8 at 44-45. On December 28, 2010, Plaintiff stated that he was "feeling good," "alright," and "trying to cope," and he would not stop taking his medication because it was working for him. Doc. 15-8 at 47-48. Plaintiff returned to MetroCare

on January 24, 2011, for a routine follow-up. Doc. 15-8 at 50. He stated that he "want[ed] to be on disability while on parole [until 2025]," and that his medications have been helpful. Doc. 15-8 at 50. In regard to his mood, Plaintiff said, "I feel better." Doc. 15-8 at 50. On what coping skills he uses, Plaintiff reported that he spends time with his family and it helps him feel better. Doc. 15-8 at 52.

In March 2011, Dr. Matthew Wong, a state agency medical consultant, conducted a psychiatric review technique assessment of Plaintiff. Doc. 15-8 at 53–65. Dr. Wong diagnosed Plaintiff with major depressive disorder, personality disorder, and alcohol dependence. Doc. 15-8 at 56, 60-61. He assessed Plaintiff with mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Doc. 15-8 at 63. Dr. Wong noted that Plaintiff appears to be responding to treatment and was not significantly impaired due to his psychiatric symptoms. Doc. 15-8 at 65. Dr. Wong concluded that Plaintiff is somewhat limited, but his symptoms do not wholly compromise his ability to function independently, appropriately, or effectively on a sustained basis, and his alleged limitations are not entirely supported by the evidence of record. Doc. 15-8 at 65.

Dr. Wong also completed a mental residual functional capacity (RFC) assessment in March 2011. Doc. 15-8 at 67-69. Dr. Wong found Plaintiff not significantly limited in most areas, but moderately limited in the following areas: the ability to understand and remember detailed instructions; the ability to carry out defaulted instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept

instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to respond appropriately to changes in the work setting.  Doc. 15-8 at 67-68.  Dr. Wong concluded that Plaintiff was able to understand, remember, and carry out detailed (but not complex) instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes.  Doc. 15-8 at 69.

      Over the course of the next two years, Plaintiff regularly sought treatment at MetroCare.  On May 11, 2011, during a follow-up visit with a nurse there, Plaintiff was advised to continue his medication regimen as prescribed and keep his follow-up appointments.  Doc. 15-8 at 89-92.  At his June appointment, Plaintiff stated that he was "doing fine" and that he tried to get up each day to "do something productive like mow lawns [and] paint houses."  Doc. 15-8 at 93.  In July, Plaintiff reported that he was "doing okay" and that he knows his triggers "and being at home daily is one of them."  Doc. 15-8 at 95.  Plaintiff also stated that he would not work at jobs that will stress him out but would be "fine with working."  Doc. 15-8 at 95.  In August, Plaintiff reported that he keeps busy with activities "like helping people with things around the house."  Doc. 15-8 at 100, 102.  At his October 4, 2011 visit, Plaintiff reported that he was "doing good," "appeared to be in a good mood," and was able to identify how staying busy helps with his depression.  Doc. 15-8 at 107.  In December 2011, Plaintiff stated that he could do a job that involved driving, but could not do manual labor.  Doc. 15-8 at 112.  Throughout 2011 and 2012, MetroCare records repeatedly document Plaintiff as stable, Doc. 15-8 at 89-92; Doc. 15-9 at 17, and in June 2012, the clinician noted that Plaintiff was compliant in his medications and was working to improve his symptoms.  Doc. 15-9 at 21.

      On August 29, 2012, Dr. Ofomata completed a medical assessment of Plaintiff's mental

5

ability to do work-related activities. Doc. 15-9 at 61-63. Dr. Ofomata opined that Plaintiff has an extreme loss of ability to: (1) maintain concentration for an extended period (two hours); (2) maintain attention or stay on task for an extended period; (3) perform at a consistent pace without an unreasonable number and length of breaks; (4) act appropriately with the general public; (5) ask simple questions or request assistance; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with co-workers without unduly distracting them or exhibiting behavioral extremes; (8) cope with normal work stress without exacerbating pathologically based symptoms; and (9) finish a normal work week without interruption from psychologically based symptoms. Doc. 15-9 at 61-62. Dr. Ofomata also concluded that Plaintiff has a substantial loss of ability to: (1) apply commonsense understanding to carry out simple one- or two-step instructions; (2) apply commonsense understanding to carry out detailed but uninvolved instructions; (3) demonstrate reliability by maintaining regular attendance and being punctual within customary tolerances; (4) make simple work-related decisions; (5) maintain personal appearance; (6) behave in an emotionally stable manner; and (7) respond appropriately to changes in a routine work setting. Doc. 15-9 at 61-62.

　　　Dr. Ofomata listed the following clinical signs of mental illness for Plaintiff: anhedonia, sleep disturbance, paranoia, difficulty thinking/confusion, chronic depression, and hallucinations. Doc. 15-9 at 62.   Dr. Ofomata checked a box next to a statement that said any instances of Plaintiff being "stable on meds" or "doing OK" in his treatment notes do not conflict with his assessment because Plaintiff has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would cause Plaintiff to decompensate. Doc. 15-9 at 63.

### C. The ALJ's Findings

In September 2012, the ALJ issued a decision unfavorable to Plaintiff. Doc. 15-3 at 21. At step one, she found that Plaintiff had not engaged in substantial gainful activity since August 24, 2010. Doc. 15-3 at 26. At step two, the ALJ noted that she had to determine whether Plaintiff had any severe impairments, and she noted that an impairment or combination thereof was severe if it "significantly limits an individual's ability to perform basic work activities" and not severe if it was "only a slight abnormality . . . that would have no more than a minimal effect on an individual's ability to work." Doc. 15-3 at 25. The ALJ then found that Plaintiff had the following severe impairments: major depressive disorder, personality disorder, cocaine abuse, and alcohol dependence in remission. Doc. 15-3 at 26. In concluding that Plaintiff's physical impairments were not severe, the ALJ noted that Plaintiff's allegations of pain were inconsistent with physical examinations, which showed only mild cervical degenerative disc disease. Doc. 15-3 at 27. At step three, the ALJ found that Plaintiff did not have an impairment that met or medically equaled the presumptively disabling conditions listed in 20 C.F.R. Part 404, Appendix 1. Doc. 15-3 at 27. The ALJ further found that Plaintiff retained the residual functional capacity to perform a full range of work at all exertional levels with the following non-exertional limitations: Plaintiff (1) is limited to work that requires not more than simple, routine, repetitive instructions; (2) should not work with the general public; and (3) is incapable of performing work that requires interaction with co-workers to accomplish required job tasks. Doc. 15-3 at 28. At step four, the ALJ found that Plaintiff could perform his past relevant work as a warehouse worker. Doc. 15-3 at 31. In determining Plaintiff's RFC, the ALJ gave Dr. Ofomata's opinion "very little weight" because it was "contrary to, inconsistent with and unsupported by the evidence of record submitted by MetroCare." Doc. 15-3 t 30.

7

## II.  LEGAL STANDARD

An individual is disabled under the Act if, *inter alia*, he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months.  [42 U.S.C. § 423(d)(1)(A)](#).  Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  [*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)](#); [42 U.S.C. §§ 405(g), 1383(C)(3)](#).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  [*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995)](#).  Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  [*Greenspan*, 38 F.3d at 236](#).

The Commissioner uses the following sequential five-step inquiry to determine whether a claimant is disabled:  (1) an individual who is working and engaging in substantial gainful activity is not disabled; (2) an individual who does not have a "severe impairment" is not disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors; (4) if an individual is capable of performing his past work, a finding of "not disabled" must be made; (5) if an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if any other work can be performed.  [*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991)](#) (summarizing [20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f)](#)).

Under the first four steps of the analysis, the burden of proof lies with the claimant. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* If the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

### III.  DISCUSSION

**A. The ALJ's finding at step two of the analysis that Plaintiff's physical impairments were not severe is supported by substantial evidence, thus, any *Stone* error was harmless.**

Plaintiff argues that the ALJ applied an incorrect severity standard at step two in finding that his physical impairments were not severe. Doc. 18 at 13. Specifically, Plaintiff insists that the ALJ's language (that the impairments were not severe because they did not "cause more than a slight effect on the claimant's ability to perform basic work-related activities") is inconsistent with and does not carry the same meaning as the standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), which "provides no allowance for 'minimal' interference on an individual's ability to work." Doc. 18 at 13. Plaintiff contends that the medical evidence shows that his elbow and hand pain caused limitations in the amount of weight he could lift and that he sometimes had to lie down due to pain, thus affecting his ability to work. Doc. 18 at 13-14.

Defendant responds that the ALJ's citation of SSR 85-28 fulfills her obligation under *Stone* to cite to either the *Stone* standard or another opinion to the same effect. Doc. 19 at 8. Regardless, Defendant points to a holding of the Court of Appeals for the Fifth Circuit that any

9

error in not applying the *Stone* standard at step two may be harmless nonetheless.  Doc. 19 at 9 (citing *Taylor v. Astrue*, 706 F.3d 600 (5th Cir. 2012) (per curiam)).  In reply, Plaintiff contends this case can be distinguished from *Taylor*, noting that the Fifth Circuit reasoned that there was not enough evidence to show harm, whereas there is ample evidence to show harm here.  Doc. 21 at 3.

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  A literal application of these regulations is inconsistent with the Act, however, because the definition includes fewer conditions than indicated by statute.  *See Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985).  Therefore, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  *Id.* at 1101, 1104-05.  The *Stone* court also held that it would assume the ALJ applied the incorrect legal standard to the severity requirement unless the correct standard was set forth by reference to *Stone* or a similar opinion, or by an express statement that the court's construction of section 404.1520(c) was used.  *Id.* at 1106.  As Defendant notes, however, *Stone* error can be harmless even where the ALJ fails to identify the specific applicable legal standard or cite to *Stone*.  *Taylor*, 706 F.3d at 603.

Here, when setting out the law in her opinion, the ALJ cited to *Stone*, but stated that "the symptoms generated by the claimant's cervical degenerative disc disease does [sic] not cause more than a slight effect on the claimant's ability to perform basic work-related activities and is therefore not considered a 'severe' impairment within the meaning of the [Act]."  Doc. 15-3 at

10

27. The ALJ's recited standard allows for the possibility that an impairment may have <u>some</u> effect on the claimant's ability to work, yet still be non-severe. This is inconsistent with *Stone*'s holding that such impairment would not be expected to interfere with the individual's ability to work . . . ." *Id.* at 1101, 1104-05. Thus, the ALJ erred. In this instance, however, the ALJ's error was harmless because the record supports the ALJ's finding that Plaintiff's cervical degenerative disc disease was not a severe impairment.

The record is all but void of medical evidence supporting Plaintiff's subjective claims of disability due to cervical degenerative disc disease. Conversely, there is substantial evidence in the record to support the ALJ's finding that Plaintiff's physical impairments were non-severe. In rejecting Plaintiff's allegations of neck pain, the ALJ noted that Dr. Tavarekere found no tenderness in Plaintiff's spine and assessed it as "normal." Doc. 15-3 at 27; Doc. 15-8 at 28. While Dr. Tavarkere found limited range of motion in Plaintiff's cervical spine, Dr. Zhao observed only mildly decreased disc space, finding no subluxation or fractures. Doc. 15-8 at 26, 29. Most notably, even though Plaintiff's visit to the emergency room was precipitated by his joint pain, Dr. Pathak found good range of motion and "no focal tenderness" in Plaintiff's cervical spine. Doc. 15-9 at 38. As to Plaintiff's allegations of joint pain, Dr. Tavarekere noted tenderness in October 2010, but observed no enlargement of the joints or limitations in range of motion. Doc. 15-8 at 28. The only other record evidence addressing Plaintiff's joint pain is his hospital emergency room visit where, despite some swelling, he was discharged in less than two hours with a prescription for Tramadol and a heightened dosage of over-the-counter Ibuprofen. Doc. 15-9 at 37-39. Thus, substantial evidence supports the ALJ's finding of non-severity, and ALJ's *Stone* error is harmless because Plaintiff's substantial rights were not affected. *Taylor*, 706 F.3d at 603.

11

### B. The ALJ properly rejected Dr. Ofomata's opinion based on the record before the Court.

Plaintiff argues that, in rejecting Dr. Ofomata's treating opinion without another first-hand medical opinion, the ALJ was required to explicitly consider each of the factors in 20 C.F.R. §§ 404.1527, 416.927.  Doc. 18 at 16.  Thus, Plaintiff concludes, the ALJ failed to comply with the dictates of *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000).  Doc. 18 at 16–17.  Plaintiff contends alternatively that, even if the ALJ's analysis was legally sufficient, substantial evidence does not support the ALJ's rejection of Dr. Ofomata's opinion.  Doc. 18 at 17.

Defendant responds that the ALJ properly considered the record in concluding that Plaintiff's treatment with MetroCare was "conservative and routine in nature."  Doc. 19 at 13 (citing Doc. 15-3 at 29-30).  Defendant insists that the Court of Appeals for the Fifth Circuit has discounted checklist opinions when discrepancies exist between the opinion and treatment records.  Doc. 19 at 13 (citing *Jones v. Astrue*, 691 F.3d 730, 733–34 (5th Cir. 2012)).  In any event, Defendant maintains that the ALJ applied the Section 404.1527 factors and was not required to recite each factor.  Doc. 19 at 14-15.

When a treating physician's opinion about the nature and severity of a claimant's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence, the Commissioner must give that opinion controlling weight.  *Newton*, 209 F.3d at 455.  "The opinion of a specialist generally is accorded greater weight than that of a nonspecialist."  *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).  A treating physician's opinion may be given little or no weight when good cause exists, however, such as "where the treating physician's evidence is conclusory [or] is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques."  *Newton*, 209 F.3d at 455–56.

Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician <u>only</u> if the ALJ performs a detailed analysis of the treating physician's views" under the criteria set forth in 20 C.F.R. § 416.1927. *Id*. at 453 (emphasis in original).  Under that section, before the Commissioner may reject a treating doctor's opinion, he must consider the following six factors: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support for the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Id.* at 455–56.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *Paul*, 29 F.3d at 211.

In rejecting Dr. Ofomata's opinion, the ALJ found that his statements, assessments and opinions were "contrary to, inconsistent with and unsupported by the evidence of record submitted by MetroCare[3] as well as the evidence of record when considered as a whole." Doc. 15-3 at 30.  The ALJ contrasts the professional observations noted during Plaintiff's numerous MetroCare appointments with Dr. Ofomata's assessment, such as Dr. Ofomata opinion that Plaintiff is extremely limited in acting appropriately with the general public and MetroCare treatment notes showing that his behavior was appropriate and his thoughts were organized. Doc. 15-3 at 30.  The medical records support the ALJ's findings and are replete with other instances in which the MetroCare treatment notes are inconsistent with Dr. Ofomata's assessment.  First, Plaintiff's symptoms generally responded to treatment, as records frequently

---

[3] The MetroCare records contain the impressions and notes of a number of professionals, not just Dr. Ofomata's.

reflect the difference his medications made. Doc. 15-8 at 50, 93, 107, 116; Doc. 15-9 at 9. Rather than suffering extreme loss in his ability to maintain concentration or perform at a consistent pace, MetroCare records noted that Plaintiff's attention was normal. Doc. 15-8 at 50, 89, 91, 98, 100, 105, 116, 120; Doc. 15-9 at 9, 17, 24, 29. Likewise, instead of showing a substantial loss in his ability to make simple decisions and maintain his personal appearance, MetroCare personnel repeatedly noted that Plaintiff's judgment was fair, his thoughts organized, and he was adequately groomed. Doc. 15-8 at 39, 50, 89, 91, 98, 100, 105, 116, 120; Doc. 15-9 at 9, 17, 24, 29. While Dr. Ofomata based his opinion largely on Plaintiff's diagnosis of depression, which he described as "severe with psychotic features," the medical records paint a different picture -- after Plaintiff's initial interview, MetroCare staff recorded no signs of psychosis during any of his follow-up visits. Doc. 15-8 at 46, 50, 89, 91, 98, 100, 105, 116, 120; Doc. 15-9 at 9, 17, 24, 29.

Indeed, after Plaintiff's initial interview, the only other affirmative mention in the record of psychotic features, paranoia, difficulty thinking, or hallucinations is Dr. Ofomata's preliminary checklist.[4] Doc. 15-9 at 68. *See Newton*, 209 F.3d at 455–56 (the ALJ is not required to any weight to a treating physician's opinion that is "conclusory [or] is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques."); *Emery v. Astrue*, No. 07-CV-0084, 2008 WL 4279388 at *5 (N.D. Tex. 2008) (Kaplan, J.) (affirming ALJ's rejection of treating physician's opinions because they were inconsistent with the medical evidence in the record).

---

[4] Dr. Ofomata also affirmatively mentioned "sleep disturbance," Doc. 15-9 at 68, but like psychotic features, the record indicates the complete opposite -- that Plaintiff had little difficulty sleeping during his treatment with MetroCare. Doc. 15-8 at 50, 98, 101, 105, 116, 120; Doc. 15-9 at 9, 17, 24, 29.

14

Thus, the Court concludes that, even if the ALJ's discussion of the Section 404.1527(c) factors was inadequate, Plaintiff was not prejudiced.  A review of the evidence of record reveals that the ALJ's decision to afford Dr. Ofomata's opinions little or no weight in concluding that Plaintiff was not disabled is supported by substantial evidence.

## IV.   CONCLUSION

For the foregoing reasons, *Plaintiff's Motion for Summary Judgment*, Doc. 17, should be **DENIED**, *Defendant's Motion for Summary Judgment*, Doc. 19, should be **GRANTED**, and the Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on January 29, 2015.

_____
RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE